1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11  TIMOTHY C. NELSON,                 No. 2:05-cv-1193-MCE-KJM

12          Plaintiff,

13      v.                             **MEMORANDUM AND ORDER**

14  CITY OF DAVIS; JAMES HYDE,
    individually and in his
15  official capacity as Chief of
    Police for the CITY OF DAVIS;
16  CALVIN HANDY, SERGEANT MICHAEL
    MASON, OFFICER JAVIER BARRAGAN,
17  OFFICER BRANDON JONES, OFFICER
    CALVIN CHANG, OFFICER M. GARCIA,
18  individually and DOES 1-100,
    inclusive,
19
            Defendants.
20

21                        ----oo0oo----

22

23      Plaintiff Timothy C. Nelson ("Plaintiff") seeks damages as

24  result of injuries he sustained during law enforcement activities

25  arising from a disturbance at an apartment complex in Davis,

26  California.  Defendants include the City of Davis, Davis Chief of

27  Police James Hyde, and Davis Police Sergeant John Wilson.

28  ///

                                    1

In addition, because University of California, Davis ("U.C. Davis" or "University") police personnel assisted the City of Davis Police Department in quelling the disturbance, Plaintiff has sued U.C. Davis Officers Calvin Handy, Javier Barragan, and Mary Garcia.  Plaintiff alleges that Defendants violated his constitutional rights by subjecting him to unreasonable seizure in violation of both the United States and California Constitutions.  Plaintiff further asserts constitutional equal protection claims, as well as additional common law and statutory claims sounding under California law.

By Memorandum and Order dated September 19, 2007, this Court granted summary judgment in favor of Defendants on the basis of Plaintiff's own version of events.  Plaintiff appealed that decision and the Ninth Circuit reversed, citing potentially conflicting evidence from other witnesses.  Following remand of the matter back to this Court for further proceedings, Defendants have filed three renewed Motions for Summary judgment, which alternatively request partial summary judgment of certain issues. The motions are brought on behalf of 1) the City of Davis Defendants (Davis, Hyde and Wilson); 2) the U.C. Davis Defendants with the exception of Calvin Chang (Handy, Barragan and Garcia) and 3) Defendant Calvin Chang, individually.

///
///
///
///
///
///

2

For the reasons set forth below, Defendants' Motions will be granted in part and denied in part.[1]

## BACKGROUND

On the evening of April 16, 2004, following the annual Picnic Day festivities held at U.C. Davis, as many as a thousand young people gathered at the Sterling Apartment complex on Cantrill Drive in Davis.  One resident of the complex described the gathering as "the biggest party in history".  Plaintiff, a twenty-year old college student, was in attendance.

The City of Davis police became aware of the party after noticing virtually gridlocked traffic along Cantrill Drive, and upon observation of illegally parked cars on both sides of the street for almost its entire length.  The police station itself was located near the apartments at the corner of Cantrill and Fifth Street, and the sergeant on duty, Defendant Wilson, dispatched police officers to begin issuing parking citations to clear the improperly parked vehicles.  The police also checked the party itself, which Sergeant Wilson described as both unusually large and loud.

///

---

[1] In conjunction with their Motions, the attorneys for Defendant Chang and the other U.C. Davis Defendants have asked the Court to take judicial notice, pursuant to Federal Rule of Evidence 201, of certain documents filed in support of the initial round of summary judgment motions filed in this case, along with the Court's prior Order of September 21, 2007 and the Ninth Circuit's subsequent decision of July 7, 2009.  Those requests are unopposed and well-taken, and are accordingly granted.

Underage alcohol violations were observed, and Wilson claims he observed individuals trying to vandalize vehicles by rocking them back and forth.  One resident described a chair being thrown from an upper story window.  After apprising an agent for the complex owner of the situation, Sergeant Wilson was asked shortly before midnight to request that all non-residents leave the premises under penalty of trespass.

The crowd did not respond to the police's initial request to disperse.  Sergeant Wilson ordered two of the officers, who had been on foot, to go back to the nearby station and return with their patrol vehicles for an additional police presence.  As one of the vehicles drove through the complex, a group of three to four-story buildings situated on a rectangular lot, Wilson observed partygoers surround the vehicle and begin throwing bottles.  Although the patrol vehicle activated its emergency lights and siren, Wilson states that it was unable to exit the complex absent rescue intervention from both himself and other officers.  Wilson then called for backup as both he and the officers retreated back to the driveway at entrance to the complex.

About forty officers arrived at the Davis Police station in response to Defendant Wilson's request, including Lieutenant Darren Patel, who upon arrival assumed the role of incident commander.  U.C. Davis police officers, including Defendants Chang, Barragan and Garcia, were among those who responded. Unlike their City counterparts, the U.C. Davis officers had pepperball launchers in their arsenal for crowd dispersal.
///

4

Pepperball launchers are dual purpose weapons that shoot round plastic balls filled with Oleoresin Capsicum ("OC") powder, a substance similar to pepperspray.  Such launchers combine the shock of kinetic impact (similar to paintballs) with the sensory discomfort associated with pepperspray.  They are designed to break apart and disperse the OC powder upon impact.

Pepperball launchers can be aimed reliably to subdue a target suspect at distances up to thirty feet.  After that point, however, it is undisputed that their trajectory becomes less reliable.  (See Pl.'s Undisputed Fact ("PUF") No. 16).  According to Plaintiff's expert, Roger Clark, pepperballs should not be fired into occupied areas at distances of more than thirty feet because of the risk of striking unintended targets in vulnerable body areas.  Pl.'s Ex. 25, Clark Dep., 24:11-27:5.[2]  Pepperball launchers may, however, be launched at hard building surfaces like walls, ceilings, doors and windows within a hundred-foot radius for effective dispersal, or "area saturation", of the OC to the surrounding vicinity.  Within these parameters, pepperball use in crowd control and riot situations meets Peace Officer Standards Training ("POST") guidelines, and further was authorized by U.C. Davis Police Department policy.

///

///

///

---

[2] For purposes of summary judgment, Defendants' objections to the Clark deposition are hereby overruled.  As discussed infra, Clark's testimony with respect to the accurate range of the pepperball launchers appears to be corroborated by at least two of the officers who used the launchers during the incident in question.

1    Following the officers' initial retreat, the evidence shows
2    that the Sterling party careened further out of control.
3    Sergeant Wilson could hear individuals shouting "fuck the police"
4    as the officers regrouped at the station.  At about 1:00 a.m.,
5    after meeting together to form a dispersal plan, between thirty
6    and forty officers proceeded on foot to the southwest corner of
7    the apartment complex in full riot gear (helmets, shields and
8    batons).  Four U.C. Davis officers, including Defendants Chang,
9    Garcia and Barragan, as well as another individual, Officer
10   Jones, carried pepperball launchers.  Defendants claim that crowd
11   dispersal orders were given, although it appears undisputed that
12   the party was loud the police had no means with which to
13   mechanically amplify any such verbal commands.  See PUF No. 6.

14   After observing the police, Plaintiff testified that he
15   retreated inside one of the complex buildings to a friend's
16   apartment.  Both officers and partygoers attest to the fact that
17   bottles and other objects were being thrown at the police from
18   various vantage points at this juncture, including upper story
19   balconies.  At least one officer was injured by a thrown bottle,
20   and several others reported only narrowly being missed on
21   numerous occasions.

22   There is no dispute that the officer's initial sweep through
23   the complex in riot gear failed to adequately disperse the
24   partygoers.  Bottles and other debris continued to be thrown at
25   the police.  A second sweep was thereafter ordered and began from
26   the southwest corner of the complex in front of a breezeway.
27   ///
28   ///

6

During that second sweep, officers observed a group of between fifteen and twenty individuals congregated at the back of that southwest breezeway.  While Officer Chang claims that bottles were being thrown from the rear of that group, (see Chang Decl., ¶ 14) two of the other officers present, Defendants Garcia and Barragan, testified that they observed no one in the breezeway throw anything at the police.  See Pl.'s Ex. 16, Garcia Dep., 103:10-12; Ex. 17, Barragan Dep., 58:2-18, 66: 2-4 (did not throw bottles, did not come at police; just stood there).  Garcia and Barragan's testimony in this regard is corroborated by one of the individuals present in the breezeway, Lee Lauduski. See Pl.'s Ex. 6, Lauduski Dep., 26-3-12.  In addition, it is undisputed that Plaintiff himself threw nothing at the police. Def. Chang's Undisputed Fact ("UF") No. 38.

According to Officer Wilson, after twice ordering those present in the breezeway to disperse without success,[3] he ordered the three U.C. Davis officers with operable pepperball launchers (Chang, Barragan, and Garcia) to fire.[4]  Estimates of the distance between the officers, at the time they began firing, and the crowd in the breezeway range from 45 to 150 feet.  Pl's Ex. 8, Dep. of Alicia Vittitoe, 42:6-19 (50 feet); Pl.'s Ex. 19; Dep. of Lopamudra Sengupta, 38:17-25 (100 to 150 feet); Pl's Ex. 10, Dep. of Defendant Wilson, 70:4-13 (45 feet).

---

[3] This testimony is countered from students present in the breezeway who claim neither heard nor understood that any such commands have been given before the launchers were employed.  See PUF No. 12.

[4] The launcher of the Officer Jones, the fourth U.C. Davis Police officer equipped with the weapon, was apparently inoperable.

7

It is undisputed that Chang, Garcia and Barragan all fired pepperballs into the breezeway.  The officers aimed both at hard surfaces adjacent to the breezeway (the doors, ceiling and walls) and at individuals who they observed throwing bottles (from below the shoulders).

While Plaintiff testified that he remained inside in an interior hallway until just before he was hit by a pepperball as he attempted to exit the building, other witnesses place Plaintiff as being outside in the breezeway for a significant period of time before any pepperballs were launched.  Bridget Collins testified, for example, that she was outside with Plaintiff in different parts of the breezeway area for close to thirty minutes before he was shot.  Pl.'s Ex. 2, Collins Dep., 43:13-52:15.  Bryan Lee-Laduski and Alicia Vittitoe appear to concur with that assessment.  Pl.'s Ex. 6, Lee-Laduski Dep. 13:5-19:22; Pl.'s Ex. 8, Vittitoe Dep., 24:15-25:9.

As a result of being struck in the left eye by one of the pepperballs, Plaintiff experienced temporary blindness in that eye and alleges a permanent loss of visual acuity.  He had to undergo multiple surgeries to repair the ocular injury he sustained.

Despite complaints lodged on Plaintiff's behalf against both the City of Davis and the University, no independent investigation of the incident was undertaken.  Defendant Hyde, as Chief of Police for the City of Davis, approved of the decision not to accept Plaintiff's complaint and relied solely on the assurances of his staff in not ordering that a Use of Force Report be prepared.  Pl.'s Ex. 14, Dep. of Chief Hyde, pp. 52-57.

In addition, the University's Use of Force Review was based solely on the officers' written reports made in conjunction with the incident.  Pl.'s Ex. 21, Handy Dep., 34:7-42:14, 95:17-24.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense.  See Fed. R. Civ. P. 56(a) ("A party seeking to recover upon a claim...may...move...for a summary judgment in the party's favor upon all or any part thereof."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); France Stone Co., Inc. v. Charter Township of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a), 56(c); Mora v. ChemTronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

///

///

9

1    In considering a motion for summary judgment, the court must
2    examine all the evidence in the light most favorable to the non-
3    moving party.  U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962).
4    Once the moving party meets the requirements of Rule 56 by
5    showing that there is an absence of evidence to support the non-
6    moving party's case, the burden shifts to the party resisting the
7    motion, who "must set forth specific facts showing that there is
8    a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477
9    U.S. 242, 256 (1986).  Genuine factual issues must exist that
10   "can be resolved only by a finder of fact, because they may
11   reasonably be resolved in favor of either party."  Id. at 250.
12   In judging evidence at the summary judgment stage, the court does
13   not make credibility determinations or weigh conflicting
14   evidence.  See T.W. Elec. v. Pacific Elec. Contractors Ass'n, 809
15   F.2d 626, 630-631 (9th Cir. 1987), citing Matsushita Elec. Indus.
16   Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

17

18                              **ANALYSIS**

19   **A.   Unreasonable Seizure Under The Fourth Amendment**
20          **1.   Whether the requisite seizure occurred**

21

22   Plaintiff's First and Fourth Claims for Relief assert his
23   right to be free from unreasonable seizures under the Fourth
24   Amendment of the United States Constitution and Article I,
25   Section 13 of the California Constitution, respectively.
26   ///
27   ///
28   ///

                                  10

The Court must necessarily initially determine whether any "seizure" has occurred giving rise to constitutional protection.[5]

"A seizure triggering the Fourth Amendment's protections occurs only when government actors have, by means of physical force or show of authority, in some way restrained the liberty of a citizen." Graham v. Conner, 490 U.S. 386, 395 n.10 (1989). The Supreme Court has further recognized that any constitutional violation in this regard "requires an intentional acquisition of physical control." Brower v. County of Inyo, 489 U.S. 593, 596 (1989). As the Brower court explained:

> "[A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), or even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means intentionally applied."

Id.

To constitute a seizure, "the taking or detention itself must be willful. This is implicit in the word 'seizure,' which can hardly be applied to an unknowing act." Id. (internal quotations omitted).

///
///
///
///

---

[5] Because the instant federal constitutional protections parallel those afforded by state constitution in this regard, the discussion that follows relies upon Fourth Amendment jurisprudence. See Sanchez v. County of San Diego, 464 F.3d 916, 928 (9th Cir. 2006).

In this case, being struck in the eye by a pepperball clearly constituted an application of force which terminated Plaintiff's movement.   The critical issue in determining whether a seizure occurred for Fourth Amendment purposes rests instead with whether or not Plaintiff was an intended object of the fusillade of pepperball bullets launched into the apartment breezeway.

While Plaintiff's own testimony indicates that he literally entered the breezeway as the projectiles were fired and was struck as soon as he exited the double doors leading from an interior hallway into the breezeway (see Pl.'s Dep., 104:18-23, 107:4-109:13), the testimony of other witnesses, as discussed above, suggests that Plaintiff had been outside in the group congregated in the breezeway for some time before the pepperballs at issue were launched.   That testimony, if given credence, places Plaintiff squarely within the group of individuals in the breezeway targeted by the police officers.   Whether it was to stop certain individuals who may have been throwing bottles at the police or simply to target the walls and ceiling around the group in order to disperse the crowd by way of "area saturation" with OC spray, a reasonable inference can be drawn that the officers intended to fire into the group of which Plaintiff may have been a part.

///

///

///

///

///

12

1    In determining the critical issue of the officer's intent in
2    launching the pepperballs, the proper inquiry must be whether any
3    rational trier of fact could conclude that Plaintiff was an
4    intended object of the police action.  In assessing the propriety
5    of summary judgment, the court must credit all inferences
6    supported by Plaintiff's evidence.  <u>Blankenhorn v. City of</u>
7    <u>Orange</u>, 485 F.3d 463, 470 (9th Cir. 2007), quoting <u>Anderson v.</u>
8    <u>Liberty Lobby, Inc.</u>, 477 U.S. at 25.  Because of the conflicting
9    evidence as to Plaintiff's whereabouts at the time of the
10   shooting, and the fact that the evidence in this regard must
11   arguably be weighed in order to reach any conclusion about
12   whether Plaintiff was among the group intentionally targeted by
13   the police, summary judgment on the question of whether a seizure
14   occurred for purposes of the Fourth Amendment cannot be had.

15    If indeed Plaintiff was a member of the breezeway group
16   targeted by the police, as the evidence arguably suggests, the
17   so-called "bystander" line of cases may be inapplicable.  In
18   <u>Landol-Rivera v. Cruz Cosme</u>, 906 F.2d 791, 795 (1st Cir. 1990),
19   the First Circuit found that no Fourth Amendment seizure occurred
20   because the plaintiff in that case was inadvertently shot during
21   the police pursuit of a robbery suspect and hence was not
22   intentionally seized by the police bullet that struck him.  As
23   the <u>Landol-Rivera</u> court noted, the plaintiff there "was not the
24   object of the police bullet that struck him."  <u>Id</u>.  Here, on the
25   other hand, the pepperspray bullets were launched at the group of
26   which Plaintiff was a part.

27   ///

28   ///

13

1  Similarly, in <u>Rucker v. Harford County</u>, 946 F.2d 278, 280 (4th

2  Cir. 1991), the Fourth Circuit ruled that a seizure within the

3  Fourth Amendment could not be demonstrated where the victim, a

4  spectator who decided to watch an unfolding police pursuit, was

5  not the "intended object" of law enforcement activity when he was

6  shot and killed by police officers attempting to apprehend a

7  fleeing criminal.  Caselaw from other circuits is also in accord.

8  <u>See</u>, <u>e.g.</u>, <u>Childress v. City of Arapaho</u>, 210 F.3d 1154, 1157

9  (10th Cir. 2000) (no seizure of hostages because officers

10 intended to restrain fugitives and the vehicle they were driving,

11 not the hostages); <u>Medeiros v. O'Connell</u>, 150 F.3d 164, 169 (2d

12 Cir. 1998) (same).

13      In <u>Fisher v. City of Memphis</u>, 234 F.3d 312 (6th Cir. 2000)

14 while the victim shot by police was only the passenger in a car

15 that attempted to strike two pedestrians, including a police

16 officer, there was no question that the police officer intended

17 to shoot generally at the vehicle in order to stop it.  The

18 <u>Fisher</u> court found that because the car was the intended target

19 of the officer's intentionally applied force, everyone in the

20 car, including the passenger, was effectively seized.  <u>Id</u>. at

21 319.  Just as the officer in <u>Fisher</u> took aim at the car as an

22 entity rather than at its specific occupants, so too may the

23 officers here have aimed at the individuals standing in the

24 breezeway, which may have included Plaintiff, as a group, and

25 likewise may Plaintiff as a member of the group been targeted and

26 accordingly seized under a Fourth Amendment analysis.

27 ///

28 ///

14

1   Also instructive, and perhaps the closest case factually to
2   the matter at bar, is the Eastern District of Washington's
3   decision in Logan v. City of Pullman, 392 F. Supp. 2d 1246 (E.D.
4   Wa. 2005).  In Logan, like this case, a student disturbance,
5   there at a nightclub rather than at an apartment complex, ensued
6   during the course of a party.  Fighting broke out involving
7   numerous individuals and two competing groups.  The description
8   employed in both cases of "mass chaos" and a "melee" is also
9   strikingly similar, as is the fact that perceptions of what was
10  occurring diverged markedly between those present.  After the
11  police were called, the officers who responded sprayed OC towards
12  the group that were actively fighting.  That spray ultimately
13  drifted into the upstairs portion of the nightclub, where panic
14  erupted as the partygoers attempted to exit the building.  In
15  analyzing the issue of whether a seizure occurred, the court
16  found that those present on the second floor were not subjected
17  intentionally to any direct spraying of the OC, and consequently
18  were not seized within the meaning of the Fourth Amendment.  The
19  Plaintiffs present on the first floor, and subject to direct
20  spraying by officers who aimed towards the group that included
21  fighting individuals, were found to be seized since the officers
22  had intentionally "dispersed O.C. in an attempt to gain physical
23  control over those individuals."  Id. at 1260.
24  ///
25  ///
26  ///
27  ///
28  ///

15

While the <u>Logan</u> opinion is clear in indicating that those present on the first floor, who were not within the group of fighting individuals, were not deliberately targeted for purposes of a Fourth Amendment seizure, it also appears that the group against whom spraying was directed included both fighting and non-fighting students (the case described the first floor "melee" as involving six to eight people along with twenty to thirty others, <u>id</u>. at 1256).  Consequently this Court reads <u>Logan</u> as standing for the proposition that OC intentionally directed towards a group of individuals may indeed effectuate a seizure of all those present in the group to whom the dispersal is aimed.  That is the very situation present here.

Given evidence indicating that Plaintiff in this case was present in a group intentionally targeted by the Defendant Officers with pepperspray launchers, the Court cannot conclude as a matter of law that no seizure of Plaintiff was effectuated here.

The fact that the pepperspray bullet that hit Plaintiff necessarily came from only one of the officers does not, as suggested by Defendant Chang, necessarily absolve everyone from liability since Plaintiff cannot show which officer fired the bullet that struck him.  Excessive force liability under 42 U.S.C. § 1983 may be predicated on an officer's "integral participation" in the alleged violation.  <u>Blankenhorn v. County of Orange,</u> 485 F.3d 463, 481 n.12 (9th Cir. 2007), citing <u>Chuman v. Wright</u>, 76 F.3d 292, 294-95 (9th Cir. 1996).

///

///

Here, at a minimum, every officer who participated in firing pepperball launches participated in a "meaningful way" in the events constituting the claimed violation, and consequently they may be liable.  <u>Id</u>. at 481, citing <u>Boyd v. Benton County</u>, 374 F.3d 773, 780 (9th Cir. 2004).

## 2.   Whether unreasonable force was employed

Even though the Court has concluded that Defendants cannot avoid potential liability under the Fourth Amendment on grounds that no qualifying seizure occurred, a seizure still does not qualify for Fourth Amendment protection unless it also deemed unreasonable.  This is because the Fourth Amendment permits police officers to use such force as is "objectively reasonable in light of the facts and circumstances confronting them." <u>Graham v. Connor</u>, 490 U.S. 386, 397 (1989).  Whether or not force is objectively reasonable must be assessed by weighing "the force which was applied.... against the need for that force."  <u>Liston v. County of Riverside</u>, 120 F.3d 965, 976 (9th Cir. 1997).  That assessment "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham</u>, 490 U.S. at 396.

According to Defendants, the use of pepperball launchers was objectively reasonable because the police was faced with a large crowd of partygoers, some of whom were throwing bottles and other items at the police.

///

///

1  Plaintiff, on the other hand, contends that various disputed

2  issues preclude the grant of summary judgment as to excessive

3  force, including the propriety of launching pepperballs against a

4  group of individuals located beyond the accurate target range of

5  the weapons, and evidence suggesting that proper crowd dispersal

6  orders may not have been issued before the fusillade began.

7      Defendants' request that the issue of excessive force be

8  determined by the Court through summary judgment must, as a

9  fundamental matter, be considered narrowly given clear precedent

10 to the effect that unreasonable force claims are generally

11 questions of fact for the jury.  Hervey v. Estes, 65 F.3d 784,

12 791 (9th Cir. 1991).  Such claims may be decided as a matter of

13 law on summary judgment only if this Court can conclude, after

14 resolving all factual disputes in favor of Plaintiff, that the

15 officers' use of force was objectively reasonable under the

16 circumstances present.  Scott v. Henrich, 39 F.3d 912, 915 (9th

17 Cir. 1994).  Summary judgment "should be granted sparingly"

18 because this inquiry "nearly always requires a jury to sift

19 through disputed factual contentions, and to draw inferences

20 therefrom."  Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002).

21     As indicated above, it is undisputed that the ability to

22 reliably aim a pepperball launcher decreases once the distance to

23 an intended target exceeds thirty feet.  PUF No. 16.   Officer

24 Chang himself admitted at deposition that accuracy of fired

25 pepperballs decreases after that point.  Pl.'s Ex. 15, Chang

26 Dep., 26:22-27:9.

27 ///

28 ///

Defendant Garcia, another officer who launched pepperballs on the evening in question, agreed that the ability to strike an individual safely at center mass decreases after thirty feet, explaining that at such distance one "would not have any precision to striking what you were trying to hit."  Pl's Ex. 16, Garcia Dep., 27:10-29:9.   Plaintiff has also produced expert testimony that pepperballs should not be fired towards individuals beyond that thirty-foot range because the anticipated trajectory of the bullet degrades beyond that point, with an increased risk of striking vulnerable body parts.  Pl.'s Ex. 25. Clark Dep., 24:11-27:5.

Defendant Wilson, the officer who ordered the volley of pepperballs that resulted in Plaintiff's injury, himself provides an estimate of approximately forty-five feet between the officers and the group congregated in the breezeway.  Pl.'s Ex. 10, Dep. of Defendant Wilson, 70:4-13 (45 feet)  Other evidence suggests that the distance in fact approached 150 feet.  <u>See</u> Pl.'s Ex. 19; Dep. of Lopamudra Sengupta, 38:17-25.  Since a distance outside the thirty-foot accurate target range of the weapons appears virtually undisputed, Plaintiff argues that the objective effect of the officers' intentional discharge of their launchers at distances outside that range was to create a risk of striking members of the group, including Plaintiff.

///

///

///

///

///

1    Even though Defendants claim that the weapons can be
2  discharged at greater distances against fixed objects like walls
3  and ceilings in order to achieve "area saturation", the dispute
4  concerning the propriety of aiming such weapons towards a group
5  under the circumstances still raises triable issues of fact not
6  amenable to disposition on summary judgment.   Additional areas
7  of factual dispute include whether anyone in the breezeway group
8  was even throwing bottles at the officers in the first place,
9  thereby calling into question the propriety of firing the
10  potentially lethal pepperballs in the first place into a crowd
11  that may have included Plaintiff.[6]   Here, at least some testimony
12  suggests that the group in the breezeway was no more than a
13  frightened group of non-threatening students trying to leave the
14  party.  See PUF No. 10.

15    Chemical irritants like the OC used in pepperballs have been
16  deemed to constitute injuring force that should not be used
17  against passive/non-violent subjects.   Headwaters Forest Defense
18  v. County of Humboldt, 276 F.3d 1125, 1131 (9th Cir. 2002).
19  ///
20  ///
21  ///
22  ///
23

24    [6] Here, the fact that evidence has been proffered suggesting
   that no one in the breezeway group had been throwing bottles
25  distinguishes the present case from the circumstances confronted
   by the police in Jackson v. Bremerton, 268 F.3d 646 (9th Cir.
26  2001). In Jackson, the peppersprayed plaintiff had unquestionably
   been actively interceding in a physical fight between the officer
27  and a suspect.  In the instant matter, on the other hand, whether
   the group of students gathered in the breezeway did anything to
28  provoke the police remains in stark dispute.

1  Further, to the extent that some in the breezeway group (although

2  not apparently the Plaintiff) deny that they even were able to

3  hear dispersal orders from the police before they resorted to

4  firing the pepperballs, this also creates an issue of fact with

5  respect to the reasonableness of the force employed that cannot

6  be resolved at the present time as a matter of law.  See, e.g.,

7  Deorle v. Rutherford, 272 F.3d 1272, 1283-84 (9th Cir. 2001)

8  (appropriate warnings should be provided in accordance with

9  proper police practice even where less than deadly force like the

10 use of a so-called "beanbag round" is to be employed).

11      In sum, given all the factual issues presented by this case,

12 the Court is unable to determine that the force employed here was

13 not excessive as a matter of law.  Consequently, Plaintiff's

14 Fourth Amendment claim for unreasonable seizure, as well as his

15 corresponding claim under the California Constitution, as set

16 forth in Plaintiff's First and Fourth Claims for Relief,

17 respectively, survive summary judgment.

18

19      **B.   Qualified Immunity**

20

21      The qualified immunity doctrine shields public officials

22 liability for the performance of their discretionary functions

23 unless the official violates a clearly established constitutional

24 norm of which a reasonable person would have known.  Harlow v.

25 Fitzgerald, 457 U.S. 800, 818 (1982).

26 ///

27 ///

28 ///

Qualified immunity consequently protects an officer from suit for a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances with which the officer is confronted.  See, e.g., Malley v. Briggs, 475 U.S. 335, 341 (1986).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court identified the purpose of the qualified immunity docrine as an acknowledgment "that reasonable mistakes can be made as to the legal constraints on particular police conduct", and a safeguard to ensure that officers are on clear notice of unconstitutional conduct before they can be sued.  Id. at 205-06.  The Court went on to articulate a two-step analysis for resolving claims of qualified immunity.  First, a court must resolve the threshold question of whether the facts, taken in the light most favorable to the part asserting the injury, show that the officer's conduct violated a constitutional right.  Second, if that question can be answered in the affirmative, the court must then determine whether the right in question is "clearly established".  Id. at 201.

Here, as the preceding sections of this Memorandum and Order already indicate, taking the evidence in the light most favorable to Plaintiff may well allow the trier of fact to determine that Defendant Officers fired their pepperball launchers into a crowd of non-threatening students in the apartment breezeway, without affording adequate warnings.  This Court has already found that such conduct may constitute a constitutional violation under the Fourth Amendment.

///

The dispositive question therefore becomes whether the right abridged by that violation was "clearly established."  To the extent that the force used was excessive, the right of non-dangerous subjects to be free from injuring force has long been clear.  See, e.g., Deorle v. Rutherford, 272 F.3d 1272, 1285 (9th Cir. 2000) (every police officer should know it is objectively unreasonable to use even a less-lethal beanbag round against an unarmed individual who presents no reasonable safety threat); Headwaters Forest Defense v. County of Humboldt, 276 F.3d 1125, 1131 (9th Cir. 2002) (should have been clear to a reasonable officer that it was excessive to use pepper spray against non-violent protestors).[7]  This Court is consequently unable to grant summary judgment on the issue of qualified immunity.

**C.  Due Process Claims**

     In addition to claims under the Fourth Amendment as discussed above, Plaintiff argues, in his Second and Fifth Claims for Relief, that his substantive due process rights were also violated by Defendants' use of force, citing the Fourteenth Amendment of the United States Constitution and Article I, § 7(a) of the California Constitution.

---

[7] While Defendants argue that the Ninth Circuit's decision in Boyd v. Benton, 374 F.3d 773 (9th Cir. 2004) should control, that case is distinguishable.  In Boyd, even though the Court found excessive force in an officer's decision to toss a "flash bang" device into an apartment where innocent bystanders were present, immunity was afforded only because, at the time, several published cases had approved prior use of such devices, and no cases had found their use to be excessive.  Id. at 781-84.  That is not the case here.

1    The concept of substantive due process protects against

2  arbitrary governmental action lacking "<u>any</u> reasonable

3  justification in the service of a legitimate governmental

4  objective."  <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 846

5  (1998).  As the Supreme Court explains, "only the most egregious

6  official conduct can be said to be arbitrary in the

7  constitutional sense" on due process grounds.  <u>Id</u>.  Even

8  negligently inflicted conduct fails to satisfy this high

9  threshold; rather, only conduct "so egregious, so outrageous that

10 it may fairly be said to shock the contemporary conscience" may

11 suffice.  <u>Id</u>. at 847.

12   As a preliminary matter, it appears that a due process

13 analysis may well be unnecessary here, since only "constitutional

14 claims asserted by persons...who were not intended targets of an

15 attempted official seizure are adjudged according to substantive

16 due process norms."  <u>Claybrook v. Birchwell</u>, 199 F.3d 350, 359

17 (6th Cir. 2000), citing <u>County of Sacramento v. Lewis</u>, 523 U.S.

18 833, 843 (1997) (substantive due process analysis inappropriate

19 if a claim is covered by the Fourth Amendment).

20   Even if Plaintiff was not an intended target of the

21 officers' pepperball launchers, however, Defendants' conduct

22 still cannot be deemed egregious and/or outrageous, as it must in

23 order to trigger due process liability.  Where, as here, police

24 officers are called in to restore order in a rapidly evolving,

25 tense environment fraught with potential danger, any due process

26 violation turns on "whether force was applied in a good faith

27 effort to maintain or restore discipline or maliciously and

28 sadistically for the very purpose of causing harm."

24

County of Sacramento v. Lewis, supra, 523 U.S. at 853.   Even "precipitate recklessness" does not suffice to "spark the shock" required to state a viable due process excessive force claim. Id.

Plaintiff argues that the officers' conduct in attempting to disperse the crowd was deliberately indifferent.  He alleges that "firing indiscriminately into a crowd was outrageous", and that the police had time to consider other means available at their disposal before resorting to the use of pepperball bullets. Plaintiff's position that this equates into egregious behavior sufficient to shock the conscience simply cannot be maintained under the circumstances.  Initial verbal requests for dispersal went unheeded, and the size of the crowd, violence in the form of throwing objects and vandalizing property, and threats against the police officers (chants of "fuck the cops") made it necessary for the police to regroup before returning in force and in riot gear to quell what was rapidly devolving into full-blown riot conditions.  Launching pepperballs, under those circumstances, even if ultimately misplaced, simply does not amount to the egregious indifference needed to state a due process claim. Consequently, Plaintiff's claim under the Fourteenth Amendment must fail, either because it is unavailable in the first place or because it lacks merit on a substantive basis.

Moreover, given the fact that the California Supreme Court has held that damages claims cannot be stated for violations of Article I, § 7(a) of the California Constitution in any event, Plaintiff's due process claim founded on the state constitution is also unavailing.

<u>Katzberg v. Regents</u>, 29 Cal. 4th 300, 324 (2002).  Therefore, the Second and Fifth Claims for Relief will be adjudicated in favor of the defense.

### D.    Violation of Equal Protection Rights

Plaintiff's Third and Sixth Claims for Relief are asserted on equal protection grounds, also pursuant to the Fourteenth Amendment to the United States Constitution and Article I, § 7(a) of the California Constitution.  This claim is based on Plaintiff's contention that the police shot him in the eye with a pepperball "due to the fact that he was a University student." <u>See</u> Defendant Chang's Undisputed Fact No. 47.

Because Plaintiff's Oppositions to Defendants' Motions concede any cause of action premised on equal protection, stating that he does not oppose dismissal of either the Third and Sixth Claims for relief (<u>see</u>, <u>e.g.</u>, Pl.'s Opp. to Def. Chang's Mot. for Summ. J., p. 25, n.2) summary adjudication as to those claims will consequently be granted.

### E.    Supervisory/<u>Monell</u> Liability

Defendant Calvin Handy, as Chief of the University of California, Davis Police Department, seeks summary adjudication as to any claims against him on grounds of negligent hiring, training supervision, and/or discipline, as set forth in the Plaintiff's Eleventh Claim for Relief.
///

26

Defendant Handy further seeks summary adjudication as to any claim that he is otherwise liable for the alleged constitutional violations of his subordinates. Defendant James Hyde, as Chief of the City of Davis Police Department, requests similar relief.  In addition, The City of Davis, which has also been named as a Defendant by Plaintiff, argues that there is no basis for any liability against it, either.

The argument with respect to Handy's liability under the Eleventh Claim for Relief is easily disposed of since Plaintiff's Opposition papers unequivocally express Plaintiff's agreement to dismiss that claim. See Pl.'s Opp. to Def. Handy's Mot. for Summ. J., p. 26, n.2.

Defendant Handy, however, as well as Chief Hyde, may still incur personal liability if they are found to have ratified the use of excessive force, even if they did not otherwise participate in any wrongful activity.  Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991); Cunningham v. Gates, 229 F.3d 1271, 1292 (9th Cir. 2000).  In addition, the City of Davis can be liable, under 42 U.S.C. § 1983 and pursuant to the Supreme Court's decision in Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978) if a direct causal link is identified between its own policy or custom and the alleged constitutional deprivation.

///

///

///

///

///

27

1    Plaintiff has produced evidence that a complaint was

2   submitted to the University Police Department following his

3   injury in the subject incident.  Although Defendant Handy

4   ostensibly ordered that an investigation be conducted, none of

5   the officers who fired the pepperballs were questioned; instead,

6   according to Plaintiff, the incident report itself was accepted

7   without any further internal investigation.  See PUF 27-29.

8   Since Handy knew that pepperballs could not be accurately

9   launched at distances greater than thirty feet (Pl.'s Exh. 21,

10   Handy Dep., 74:21-76:3), Plaintiff argues that Handy in effect

11   ratified what he knew, or should have known, amounted to

12   excessive force.  Evidence that a supervisor failed to act on

13   information which supported an inference of unconstitutional

14   conduct is sufficient to defeat summary judgment.  Watkins v.

15   City of Oakland, 145 F.3d 1087, 1093-94 (9th Cir. 1998).  The

16   Court consequently cannot grant qualified immunity to Defendant

17   Handy.

18    Defendant Hyde and the City of Davis fare no better.  Hyde

19   appears to have approved of the decision not to order a citizen's

20   complaint investigation into the allegations Plaintiff lodged

21   against the City (see Pl.'s Exh. 14, Hyde Dep., 54:7-56:15),

22   despite the fact that two of the students present at the time of

23   Plaintiff's injury, Bridget Collins and Bryan Lee-Laudusky, went

24   to the Davis Police Department and submitted statements to the

25   effect that Plaintiff had simply been trying to leave the party

26   and had done nothing to threaten the police at the time he was

27   shot.  PUF No. 23.

28   ///

That ratification on Hyde's part is enough to support an
inference that the allegedly unconstitutional conduct was
consistent with the policies of the City of Davis itself.  <u>St.
Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988); <u>Larez v. City of
Los Angeles</u>, 946 F.2d at 645-46.

**F.   Causes of Action Premised Upon State Law**

Pendent state claims asserted by Plaintiff include claims
for assault and battery, negligence, violation of the Bane Act,
California Code of Civil Procedure § 52.1, and intentional
infliction of emotional distress.  The Court's findings with
respect to potential Fourth Amendment liability for unreasonable
seizure largely mandate that Defendants' requests for summary
adjudication as to the state claims fail as well.

Turning first to assault and battery, it is clear that an
assault and battery claim against a police officer requires that
unreasonable force be established.  <u>Edison v. City of Anaheim</u>, 63
Cal. App. 4th 1269, 1272 (1998); <u>Finley v. City of Oakland</u>, 2006
WL 269950, *14 (N.D. Cal. 2006).  Because the same standards
apply to both state law assault and battery and Section 1983
claims premised on constitutionally prohibited excessive force,
the fact that Plaintiff's § 1983 claims under the Fourth
Amendment survive summary judgment also mandates that the assault
and battery claims similarly survive.

///

///

///

29

1   <u>See</u>, <u>e.g.</u>, <u>Susag v. City of Lake Forest</u>, 94 Cal. App. 4th 1401,
2   1412-13 (2002) ("it appears unsound to distinguish between
3   section 1983 and state law claims arising from the same alleged
4   misconduct"); <u>Saman v. Robbins</u>, 173 F.3d 1150, 1156-57 (9th Cir.
5   1999) (treating Section 1983 and state law battery claim as
6   synonymous).

7       Second, Plaintiff's negligence claim requires an assessment
8   of whether the officers used reasonable care in quelling the
9   subject disturbance.  <u>Miller v. Kennedy</u>, 196 Cal. App. 3d 141, 144
10  (1987).  This is akin to the analysis employed under the Fourth
11  Amendment, as set forth above.  The fact that the Court has
12  already determined, after resolving all inferences in favor of the
13  Plaintiff, that unreasonable force for purposes of the Fourth
14  Amendment may have been employed similarly directs a conclusion
15  that Plaintiff's negligence claims survive as well.  <u>See</u>, <u>e.g.</u>,
16  <u>David v. City of Fremont</u>, 2006 WL 2168329 at *21 (N.D. Cal. 2006)
17  (California courts apply the same standard used under a Fourth
18  Amendment analysis in evaluating a state law negligence claim).

19      Third, with respect to California Code of Civil Procedure
20  § 52.1, that section enables individuals to sue for damages as a
21  result of constitutional violations.  <u>Reynolds v. County of San</u>
22  <u>Diego</u>, 84 F.3d 1162, 1170-71 (9th Cir. 1996), aff'd in part and
23  rev'd in part on other grounds in <u>Acri v. Varian Assocs.</u>,
24  114 F.3d 999 (9th Cir. 1997).  The Court has already identified a
25  potential constitutional violation in this case.  The unjustified
26  use of force by a police officer is a recognized basis for
27  liability under § 52.1.  <u>Venegas v. County of Los Angeles</u>,
28  32 Cal. 4th 820, 843 (2004).

The analogous nature of the state law claims to violations sounding under the Fourth Amendment, however, does not extend to Plaintiff's claim for intentional infliction of emotional distress.  Under California law, the tort of intentional infliction requires Defendants to have engaged in extreme and outrageous conduct with the intention of causing severe emotional distress.  Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965, 1001 (1993).  The requirement of "extreme and outrageous" conduct for purposes of intentional infliction closely follows the "egregious and outrageous" standard for due process liability under the Fourteenth Amendment.  See County of Sacramento v. Lewis, 523 U.S. at 847.  The Court's dismissal of Plaintiff's due process claim compels the rejection of his analytically similar cause of action for intentional infliction of emotional distress.

Finally, while Defendants also argue that statutory immunity under California Government Code § 820.2 should also apply to bar Plaintiff's state law claims, that contention too is misplaced. Section 820.2 shields governmental employees from liability for exercising their discretionary functions.  The discretionary immunity conferred by the statute, however, is reserved for basic policy-level decisionmaking.  Johnson v. State, 69 Cal. 2d 782, 793 (1968).  It does not protect tactical choices found to be unreasonable, like firing pepperball launchers into a group of non-violent students attempting to leave an out-of-control party (if the inferences from some of Plaintiff's evidence is ultimately given credence).

///

///

1   See Bell v. State of California, 63 Cal. App. 4th 919, 929

2   (1998).  Nor does § 820.2 provide protection against allegations

3   that police officers used excessive force.  Scruggs v. Haynes,

4   252 Cal. App. 2d 256, 264 (1967).

5

6                              **CONCLUSION**

7

8        Based on the foregoing, Defendants' Motions for Summary

9   Judgment (Docket Nos. 136, 137 and 139) are DENIED.  To the

10  extent that said motions also request summary adjudication as to

11  certain claims, however, they are GRANTED in part and DENIED in

12  part.[8]  Summary adjudication is granted as to the Second, Third,

13  Sixth, Ninth and Eleventh Claims for Relief.  Defendants'

14  requests for summary adjudication are, however, otherwise denied.

15       IT IS SO ORDERED.

16
    Dated: April 28, 2010
17

18                              _____

19                              MORRISON C. ENGLAND, JR.
                                UNITED STATES DISTRICT JUDGE
20

21

22

23

24

25

26

27       [8] Because oral argument will not be of material assistance,
    the Court ordered this matter submitted on the briefing.  E.D.
28  Cal. Local Rule 230(g).

                                   32